# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ETHAN WADLINGTON,** | : CIVIL NO. 1:18-CV-793 |
| **Plaintiff** | : (Chief Judge Conner) |
| v. | : |
| **WARDEN TAMMY FERGUSON,** *et al.*, | : |
| **Defendants** | : |

## **MEMORANDUM**

Plaintiff Ethan Wadlington ("Wadlington"), an inmate who, at all relevant times, was housed at the State Correctional Institution at Benner, Pennsylvania ("SCI-Benner"), commenced this action pursuant to 42 U.S.C. § 1983. (Doc. 1). Named as defendants are Warden Ferguson, Sergeant Koeck, and a John Doe Correctional Officer. (Id.) The allegations of the complaint relate to alleged violations of Wadlington's rights arising out of an attack by other inmates in his cell. (Id.)

Presently ripe for disposition is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 24). For the reasons set forth below, the court will grant defendants' motion. The court will also dismiss the action against the John Doe defendant pursuant to Federal Rule of Civil Procedure 4(m).

## I. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## II. Statement of Material Facts[1]

The events giving rise to this action occurred at SCI-Benner. (Doc. 26, ¶ 5, Statement of Material Facts; Doc. 31, ¶ 8, Counterstatement of Material Facts). While housed at SCI-Benner, Wadlington was in general population and had a cellmate. (Doc. 26, ¶ 6; Doc. 31, ¶ 9). In general population at SCI-Benner, the cell doors can be opened by pressing a button at a station. (Doc. 26, ¶ 7; Doc. 31, ¶ 10). The doors can be opened individually or all at once. (Doc. 26, ¶ 8; Doc. 31, ¶ 11). An inmate can request for his cell door to be opened. (Doc. 26, ¶ 9; Doc. 31, ¶ 12). An inmate in a cell has access to an intercom that allows the inmate to communicate

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial, and "shall include references to the parts of the record that support the statements." Id.; see also (Doc. 28, ¶ 3(b)) (advising Wadlington that his responsive statement of material facts must include specific references to the parts of the record that support the statements, and failure to comply with Local Rule 56.1 would result in the facts set forth in defendants' statement of material facts being deemed admitted). Wadlington does not dispute the factual contentions in paragraphs 1-20, 32-40, 42-46, 50-51, 54, 56, 58-60, 63-65, and 68-70 of defendants' statement of material facts. (See Doc. 31). Wadlington admits in part and denies in part defendants' factual contentions in paragraphs 21-31, 41, 47-49, 52-53, 55, 57, 61-62, 66-67, and 71. (See id.) Wadlington's partial denial of these statements are devoid of any citations to the record; instead, he states, "[s]trict proof to the contrary demanded at time of hearing." (Id.) Nonetheless, the court has undertaken an independent review of the record to confirm defendants' facts and to attempt to discern Wadlington's bases for disputing those facts. The court finds that there is no factual basis in the record for Wadlington's disputes, and has disregarded his conclusory allegations and treated the facts as uncontested.

with the correctional officer in charge of the doors when he would like the cell opened. (Doc. 26, ¶ 10; Doc. 31, ¶ 13).

On November 5, 2017, Wadlington and his cellmate were in their cell during the morning hours. (Doc. 26, ¶ 11; Doc. 31, ¶ 14). At some point, Wadlington's cell door opened, and several inmates entered and began to assault him. (Doc. 26, ¶ 12; Doc. 31, ¶ 15). Wadlington does not know who caused his cell door to be opened and does not know why his cell door was opened. (Doc. 26, ¶¶ 13-14; Doc. 31, ¶¶ 16-17). Wadlington did not know the individuals who attacked him and did not know why he was assaulted. (Doc. 26, ¶¶ 15-16; Doc. 31, ¶¶ 18-19). Wadlington did not feel in danger at SCI-Benner until after the attack. (Doc. 26, ¶ 17; Doc. 31, ¶ 20).

After the attack, Wadlington was taken to the medical department. (Doc. 26, ¶ 18; Doc. 31, ¶ 21). After he was released from medical, he was immediately placed in administrative custody. (Doc. 26, ¶ 19; Doc. 31, ¶ 22). Administrative custody is essentially protective custody for inmates in danger. (Doc. 26, ¶ 20; Doc. 31, ¶ 23).

On November 6, 2017, at 3:10 a.m., medical records indicate that Wadlington was treated for trauma to his right eye following the assault by other inmates. (Doc. 26, ¶ 21; Doc. 31, ¶ 24). On November 6, 2017, at 10:10 a.m., medical staff ordered an x-ray of Wadlington's facial bones with attention to the right orbital side. (Doc. 26, ¶ 22; Doc. 31, ¶ 25). On November 6, 2017, at 12:00 p.m., medical records indicate that Wadlington had blurry vision and swelling to his right eye. (Doc. 26, ¶ 23; Doc. 31, ¶ 26). He did not lose consciousness, he ambulated well, and had swelling to his forehead and the back of his head. (Id.) The medical records also note that

Wadlington's pupils were equal, round, and reactive to light, he had no raccoon eyes and no drainage from his ear. (Doc. 26, ¶ 24; Doc. 31, ¶ 27).

The x-ray revealed a broken nose. (Doc. 26, ¶ 25; Doc. 31, ¶ 28). Wadlington was not diagnosed with a skull fracture. (Doc. 26, ¶ 26; Doc. 31, ¶ 28).

On November 17, 2017, Wadlington was again treated by medical. (Doc. 26, ¶ 27; Doc. 31, ¶ 29). The medical records indicate that the swelling in his right eye decreased and his broken nose would continue to improve. (Id.) It was noted that Wadlington's condition was improving. (Doc. 26, ¶ 28; Doc. 31, ¶ 30). Wadlington did not have a fractured skull, and the records do not reference a swollen left eye. (Doc. 26, ¶¶ 29-30; Doc. 31, ¶¶ 31-33).

While he was in administrative custody, Wadlington had access to sick call slips and requests to staff members. (Doc. 26, ¶¶ 31, 33; Doc. 31, ¶¶ 34, 36). After the attack, and while in administrative custody, Wadlington filed approximately two sick call slips, and two or three requests to staff members per week. (Doc. 26, ¶¶ 32, 34; Doc. 31, ¶¶ 35, 37).

Wadlington was not released back to general population while at SCI-Benner. (Doc. 26, ¶ 35; Doc. 31, ¶ 38).

Wadlington is aware of the grievance procedure. (Doc. 26, ¶ 36; Doc. 31, ¶ 39). On December 22, 2017, Wadlington filed a grievance related to the assault on November 5, 2017. (Doc. 26, ¶ 43; Doc. 31, ¶ 46). The grievance was received by the Grievance Coordinator on December 29, 2017 and assigned grievance number 713441. (Doc. 26, ¶ 44; Doc. 31, ¶ 47). Grievance number 713441 does not name

defendant Koeck. (Doc. 26, ¶ 45; Doc. 31, ¶ 48). Grievance number 713441 names "the officer working 1st shift." (Doc. 26, ¶ 46; Doc. 31, ¶ 49). Wadlington cannot specify whether "the officer working 1st shift" is defendant Koeck or a John Doe. (Doc. 26, ¶ 47; Doc. 31, ¶ 50). In the grievance, Wadlington states that he was a low security inmate housed on a block with high risk and violent inmates. (Doc. 26, ¶ 48; Doc. 31, ¶ 51). The grievance also complains that the location of his cell made it easy for inmates to attack him due to low visibility. (Doc. 26, ¶ 49; Doc. 31, ¶ 52). Grievance number 713441 was rejected as untimely because it was not filed within fifteen working days after the event. (Doc. 26, ¶ 50; Doc. 31, ¶ 53).

On January 8, 2018, Wadlington appealed the grievance rejection. (Doc. 26, ¶ 51; Doc. 31, ¶ 54). In his appeal, Wadlington claimed that he was not able to timely file a grievance because he had a fractured skull, his eyes were swollen shut, and he suffered from headaches. (Doc. 26, ¶ 52; Doc. 31, ¶ 55). His grievance appeal does not claim that he was unable to obtain a grievance form. (Doc. 26, ¶ 53; Doc. 31, ¶ 56). The Facility Manager upheld the initial grievance rejection because the grievance was not timely filed. (Doc. 26, ¶ 54; Doc. 31, ¶ 57). The Appeal Response stated:

> I have been advised by medical personnel that your medical condition at that this [sic] time would not have prevented you from being able to proceed with daily activities such as filing paperwork. Additionally, in accordance with departmental policies and procedures, a time extension for filing grievances was available by contacting the Facility Grievance Coordinator of the reason for the delay. You did not contact the Grievance Coordinator to request a time extension.

(Doc. 26, ¶ 55; Doc. 31, ¶ 58).

Wadlington filed an appeal to final review. At the final appeal level, the Chief Grievance Officer found that the grievance was properly rejected at the facility level as untimely. (Doc. 26, ¶ 56; Doc. 31, ¶ 59).

From November 5, 2017, the date of the assault, through December 22, 2017, the date Wadlington filed grievance number 713441, he filed requests to staff members and sick call slips. (Doc. 26, ¶ 57; Doc. 31, ¶ 60).

On January 4, 2018, Wadlington filed an additional grievance related to the assault. (Doc. 26, ¶ 58; Doc. 31, ¶ 61). The grievance was received on January 8, 2018 and was assigned grievance number 714641. (Doc. 26, ¶ 59; Doc. 31, ¶ 62). Wadlington lodged grievance number 714641 against the "personnel in the security department" for keeping him in administrative custody and requested "security to put in the paperwork for me to be transferred immediately or let me back out in to population." (Doc. 26, ¶ 60; Doc. 31, ¶ 63). Grievance number 714641 does not reference defendants Koeck or Ferguson. (Doc. 26, ¶¶ 61-62; Doc. 31, ¶ 64-65). Wadlington withdrew the grievance because the issue was resolved. (Doc. 26-1, at 12).

On January 24, 2018, Wadlington filed another grievance related to the assault. (Doc. 26, ¶ 63; Doc. 31, ¶ 66). The grievance was received on January 25, 2018 and was assigned grievance number 718029. (Doc. 26, ¶ 64; Doc. 31, ¶ 67). Wadlington lodged grievance number 718029 against the "medical department" and the grievance pertained to his inability to obtain a copy of his medical records for his family. (Doc. 26, ¶ 65; Doc. 31, ¶ 68). Grievance number 718029 does not

reference defendants Koeck or Ferguson. (Doc. 26, ¶¶ 66-67; Doc. 31, ¶¶ 69-70). Wadlington has never filed a grievance related to retaliation. (Doc. 26, ¶ 68; Doc. 31, ¶ 71).

On January 31, 2018, Wadlington was transferred to the State Correction Institution at Rockview. (Doc. 26, ¶ 69; Doc. 31, ¶ 72).

### III. Discussion

Defendants move for summary judgment on Wadlington's claims arguing, *inter alia*, that he failed to properly exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1996 (the "PLRA") before initiating this lawsuit. (Doc. 25, at 11-16). The PLRA requires a prisoner to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions. See 42 U.S.C. § 1997e(a); Booth v. Churner, 206 F.3d 289, 291 (3d Cir. 2000). Section 1997e(a) establishes the requirement of administrative exhaustion:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The PLRA "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). It has been made clear that the exhaustion requirement is mandatory. See Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth

8

v. Churner, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (same). "[I]t is beyond the power of [any] court . . . to excuse compliance with the exhaustion requirement." Nyhuis, 204 F.3d at 73 (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp.2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. See Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of administrative remedies, but also substantial compliance with procedural requirements. Id. at 227-32; see also Nyhuis, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. Spruill, 372 F.3d at 227-32; see also Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). Finally, whether an inmate has properly exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts. See Small v. Camden County, 728 F.3d 265, 268 (3d Cir. 2013); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010).[2]

The Department of Corrections ("DOC") has an Inmate Grievance System, set forth in DC-ADM 804, which permits any inmate to seek review of problems that

---

[2] In accordance with Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018), the court placed the parties on notice that it would consider exhaustion in its role as fact finder and afforded the parties the opportunity to be heard under Small, 728 F.3d at 268. (Doc. 34).

9

may arise during the course of confinement. See 37 PA. CODE § 93.9(a); PA. DEP'T OF CORR., No. DC-ADM 804. After an attempt to resolve any problems informally, an inmate may submit a written grievance to the Facility's Grievance Coordinator for initial review. This must occur within fifteen days after the events upon which the claims are based. Within fifteen days of an adverse decision by the Grievance Coordinator, an inmate may then appeal to the Facility Manager of the institution. Thereafter, within fifteen days of an adverse decision by the Facility Manager, an inmate may file a final appeal to the Secretary's Office of Inmate Grievances and Appeals. An appeal to final review cannot be completed unless an inmate complies with all established procedures. An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue. See Booth, 206 F.3d at 293 n. 2 (outlining Pennsylvania's grievance review process); Ingram v. SCI Camp Hill, 448 F. App'x 275, 279 (3d Cir. 2011) (same).

On December 22, 2017, Wadlington filed grievance number 713441 regarding the assault on November 5, 2017. The grievance was denied as untimely at all levels of review. Although Wadlington pursued this grievance to final review, defendants argue that the grievance was not timely filed. (Doc. 25, at 13-16). Defendants thus argue that Wadlington procedurally defaulted his claims against them.

### A. Failure to Timely File Grievance Number 713441

On December 22, 2017, Wadlington filed grievance number 713441, forty-seven (47) days after the November 5, 2017 assault. (Doc. 26-3, at 14). In order to be timely, the grievance had to be submitted by November 24, 2017. (See DC-ADM 804, Section 1.A.8, requiring that an initial grievance be submitted within fifteen (15) working days of the events about which it complains). Wadlington's grievance filed on December 22, 2017 was twenty (20) working days late. It is undisputed that the grievance was untimely and was rejected at all levels of review as untimely. Wadlington asserts that his grievance was not timely filed for shifting reasons: in his appeal to the Facility Manager, Wadlington stated that his injuries left him too traumatized to file a timely grievance, and Wadlington presently claims that he was not provided a grievance form despite his request.

In the grievance system, Wadlington asserted that his grievance was not timely filed due to his injuries. (Doc. 26-3, at 12). The evidence does not support this assertion. The medical records reflect that, immediately after the assault, Wadlington had a broken nose and swelling in his right eye and head, but he did not lose consciousness, he walked well, did not have raccoon eyes or drainage from his ear, and he was never diagnosed with a fractured skull. (Doc. 26-1, at 5-7). On November 17, 2017, Wadlington was again examined by medical and he reported that his condition continued to improve. (Id. at 7). Additionally, when rendering a decision on Wadlington's grievance appeal, the Facility Manager contacted the medical department and was advised that his medical condition would not have prevented him from filing paperwork. (Doc. 26-3, at 10). The Facility Manager also

11

noted that Wadlington failed to request an extension of time to file a grievance, in accordance with DOC policy. (Id.) (see also DC-ADM 804, Section 1.C.2, providing that time extensions for filing a grievance will be considered on a case-by-case basis and that the inmate "must" notify the Facility Grievance Coordinator of the reason for the delay).

In the instant action, Wadlington claims, for the first time, that his placement in the RHU "prevented the grievance form from being available without a Corrections Officers' assistance," which "essentially" hindered his ability to file a grievance. (Doc. 32, at 8-9). While Wadlington suggests that prison staff in the RHU denied him access to the grievance process, he fails to come forward with any credible evidence to support this allegation. Wadlington admits that SCI-Benner "did not 'play hide-and-seek with administrative remedies.'" (Doc. 30, at 8). He further concedes that he was able to obtain other forms while housed in the RHU, such as cash slips, requests to staff members, and sick call slips. (Doc. 26, ¶¶ 31, 33; Doc. 31, ¶¶ 34, 36). The record reveals that, from the date of the assault through the date Wadlington filed grievance number 713441, he filed requests to staff members and sick call slips. (Id.) Additionally, Wadlington filed at least two other grievances while housed in the RHU. (Doc. 26-1, at 13-17). Wadlington's ability to file inmate request slips and grievances squarely contradicts his argument that he was denied access to the grievance process. Furthermore, Wadlington has not identified any prison officials who purportedly denied his request for a grievance, and has not provided a declaration, affidavit, or any documentation in support of his allegation. Wadlington's conclusory, unsupported statement is insufficient to survive summary

judgment. See Pappas, 331 F. Supp. at 315; see also FED. R. CIV. P. 56(e). The record is void of any evidence which demonstrates that the actions of any prison officials caused Wadlington to fail to properly exhaust his grievance. Thus, Wadlington's claims are barred on administrative exhaustion grounds, and defendants are entitled to summary judgment.

## IV. Federal Rule of Civil Procedure 4(m)

Rule 4(m) sets forth the following time frame a plaintiff has to serve a defendant with the summons and copy of the complaint:

> If a defendant is not served within 90 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m).

The John Doe defendant was named in the complaint that was filed on April 10, 2018 and, to date, has not been identified or served in this case. The court must engage in a two-step process in determining whether to dismiss the non-served defendant or grant Wadlington additional time to effect service. "First, the district court should determine whether good cause exists for an extension of time. If good cause is present, the district court must extend time for service and the inquiry is ended. If, however, good cause does not exist, the court may in its discretion decide whether to dismiss the case without prejudice or extend time for service." Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1305 (3d Cir. 1995). Good cause requires good faith on the part of the party seeking an enlargement and some

13

reasonable basis for noncompliance with the time specified in the rules. MCI Telecomm. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1097 (3d Cir. 1995). In determining whether good cause exists, a court's "primary focus is on the plaintiff's reasons for not complying with the time limit in the first place." Id. Although prejudice is a factor to be considered, the absence of prejudice to the opposing party alone does not constitute good cause to excuse late service. Id.

In the present matter, Wadlington failed to establish good cause. Indeed, his response to the rule to show cause merely recites to his *pro se* status and requests leniency to "allow proper service under the less stringent standard of a *Pro Se Litigant*." (Doc. 35, at 2, ¶3). Wadlington's reason is a deflection, not a good faith explanation. Wadlington's *pro se* status is not good cause to excuse his failure to timely identify or serve this defendant. Veal v. United States, 84 F. App'x 253, 256 (3d Cir. 2004). Based upon the lack of any reasonable explanation for his failure to adhere to the requirements of Rule 4, the court finds that Wadlington failed to establish good cause.

If a plaintiff cannot show good cause for his failure to serve the defendant within ninety days, a district court may either dismiss the defendant, or exercise its discretion to order that service be made within a specific time. Petrucelli, 46 F.3d at 1305; see also FED. R. CIV. P. 4(m). As noted, it is Wadlington's responsibility to properly identify all defendants, and provide accurate mailing addresses for the defendants, in a timely fashion. (See Doc. 12, ¶ 5) (advising Wadlington that failure to properly name a defendant, or provide an accurate mailing address for a

defendant, may result in dismissal of the claims against that defendant pursuant to Federal Rule of Civil Procedure 4(m)).

In light of Wadlington's lack of good faith effort to identify or serve the John Doe defendant despite this court's warning of the possible consequences, including dismissal, the court concludes that dismissal is appropriate under the present circumstances. Accordingly, the non-served defendant will be dismissed from this action.

## V. Conclusion

For the reasons set forth above, the court will grant defendants' motion (Doc. 24) and enter summary judgment in their favor. The court will also dismiss the action against the John Doe defendant pursuant to Federal Rule of Civil Procedure 4(m).

An appropriate order shall issue.

/S/ Christopher C. Conner
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: September 4, 2019